J-S77001-16

J-S77002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.G.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: N.G.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 689 MDA 2016 |

Appeal from the Order Entered March 30, 2016
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000074-2014

| | | |
|---|---|---|
| IN RE: ADOPTION OF: Z.G.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: N.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 692 MDA 2016 |

Appeal from the Decree March 30, 2016
In the Court of Common Pleas of York County
Orphans' Court at No(s): 2015-0133

BEFORE: PANELLA, J., OLSON, J., and PLATT*, J.

MEMORANDUM BY PANELLA, J. **FILED DECEMBER 28, 2016**

N.G.G., ("Mother") appeals from the decree and order entered on

March 30, 2016, granting the petition filed by the York County Children and

Youth Services ("CYS" or the "Agency"), seeking to involuntarily terminate

---

* Retired Senior Judge assigned to the Superior Court.

her parental rights to her dependent, minor child, Z.G.D., a female born in June 2008 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(5), (8), and (b), and to change Child's permanency goal to adoption under the Juvenile Act, 42 Pa.C.S.A. § 6351.[1] We affirm.[2]

Mother and Father have a criminal history of incarceration. Father is presently incarcerated at the State Correctional Institution ("SCI") at Camp Hill. *See* N.T, 12/21/16, at 7. At the time of the hearings in this matter, Mother was residing in a halfway house after release from her incarceration.

On January 23, 2014, CYS received a referral alleging drug abuse and incarceration of both parents. *See* N.T., 1/21/16, at 8. Child was living with B.G., ("Maternal Grandmother"), who stated that she would not be able to keep Child in her home due to personal circumstances. *See id*. at 9. On March 21, 2014, CYS filed a dependency petition. Thereafter, on April 16, 2014, the trial court adjudicated Child dependent pursuant to 42 Pa.C.S.A. § 6302(1), and ordered her removed from the home of maternal

---

[1] In a separate decree entered on March 30, 2016, the trial court confirmed the consent of T.D. ("Father"), Child's father, to the adoption of Child, and the voluntary termination of his parental rights. Father has not filed an appeal from the termination of his parental rights and the change of Child's permanency goal to adoption, nor is he a party to the present appeal.

[2] We are addressing Mother's appeals from the decree and order in the same memorandum for ease of disposition, as the trial court addressed the appeals together in its opinion, as did Mother in her briefs on appeal. Accordingly, we have consolidated these appeals.

grandmother, and placed Child in kinship foster care in the home of a paternal friend, M.D. ("Foster Mother"). M.D. was Father's former paramour, and had cared for Child in the past. **See** N.T., 1/21/16, at 11. The trial court directed that legal and physical custody remain with CYS. The trial court established Child's permanency goal as return to parent or guardian. Subsequently, the trial court held a series of permanency review hearings.

In the dependency matter, on November 10, 2015, CYS filed a petition for a change in the permanency goal to adoption. In the termination matter, on November 12, 2015, CYS filed a petition for involuntary termination of parental rights of Mother and Father. CYS also filed a petition to confirm Father's consent to adoption, reciting that Father executed his consent to adoption on October 15, 2015. Father filed his consent to adoption on November 10, 2015. The trial court held a permanency review hearing on November 24, 2015, and maintained Child's placement and permanency goal.

On December 21, 2015, and January 21, 2016, the trial court held hearings on the termination and goal change petitions. At the hearing on December 21, 2015, Father testified, via telephone, regarding his consent. The trial court then questioned Child, *in camera*, as did Mother's counsel. **See** N.T., 12/21/15, at 17-22. Child testified that she likes to visit Mother, and that she would be sad if she did not get to see Mother again. **See id**. at

22. Neither the guardian *ad litem* for Child nor CYS's counsel had any questions for Child. **See id**. at 22.

Next, CYS presented the testimony of Marguerite Barger, who is employed doing drug and alcohol testing for Families United Network, and has been involved with conducting drug and alcohol testing on Mother. **See id**. at 25-26. CYS then presented the testimony of Melanie Ferree Wurster, who is the program supervisor for Family Engagement Services at Pressley Ridge. **See id**. at 30. Ms. Wurster worked with providing services to Mother between March 17, 2015, and June 5, 2015, when Mother became incarcerated and, consequently, the case was closed as unsuccessful. **See id**. at 32.

On cross-examination by Mother's counsel, Ms. Wurster testified that she had seen a few minutes of a visit between Mother and Child where direct services were provided by Jaqueline Hernandez. **See id**. Ms. Wurster stated that the visit was very natural, and that Child enjoyed spending time with Mother. **See id**. Child arrived, did some homework, Mother made dinner, and then they played. **See id**. at 32-33. Ms. Wurster did not have any concerns about the nature of the interaction while she was present. **See id**. at 33. She explained that Pressley Ridge was supervising the weekly visitation, which was approximately two hours, and was also providing parenting coaching one time per week with Mother. **See id**. at 33.

Next, CYS presented the testimony of Ellie Williams, the Executive Director of, and mental health therapist, at Equiteam Support Services ("ESS"). *See id*. at 41-42. ESS provides equine assistance psychotherapy and mental health services to at-risk youth and families in need. *See id*. Ms. Williams, who holds a master's degree in mental health counseling, was qualified as an expert in the area of child therapy and, in particular, Reactive Attachment Disorder ("RAD"). *See id*. at 57-59. On April 25, 2014, ESS received a referral of Child for Child's diagnosis and issues that CYS wished to have addressed. *See id*. at 42. ESS conducted an intake regarding Child on May 8, 2014, and rendered its assessment on May 15, 2014. *See id*.

ESS assessed Child as having RAD, attachment issues, and placement outside her family home. *See id*. at 42-43. Ms. Williams met with Child, and with Child and Foster Mother, and Child and Mother (until Mother's incarceration), on a weekly basis. *See id*. at 43-44. Ms. Williams explained that, because Child was moved from placement to placement in early childhood years, she was unable to form a healthy attachment to a caretaker. *See id*. Therefore, Ms. Williams is working with Child to learn to form an attachment to Child's caretaker. *See id*. Ms. Williams stated that Child is incapable of forming a parent/child bond with another person. *See id*. at 44.

Ms. Williams explained that RAD is a very rare and extremely difficult mental health diagnosis to address, and requires a significant deployment of

resources. *See id*. at 44-45. Ms. Williams stated that Child is very angry with Mother, and has stated that Mother is a liar and breaks her promises. *See id*. at 46. In December 2014, Ms. Williams began incorporating Mother into the therapy sessions with Child, and she continued the therapy including Mother for six months until Mother became incarcerated in June 2015. *See id*. at 45-46. Child has trust issues with Mother, fears Mother, and does not feel safe with her. *See id*. at 47. In order to establish a healthy bond with Mother, Child would have to have safety, security, and to know that Mother is not going to leave and be incarcerated again. *See id*. at 48-49. Mother would have to engage in specialized parenting training, which Ms. Williams did not observe in Mother during the six months that she interacted with Mother. *See id*. at 49. Mother's lack of specialized parenting skills would put Child at risk for multiple placements. *See id*.

On questioning by the court, Ms. Williams stated that Child needs to have contact with Mother throughout her life, because she knows Mother and she is not an infant. *See id*. at 71. However, Ms. Davis responded that, if an open adoption is not possible, if the choice were to maintain the status quo or terminate Mother's parental rights, Child will suffer less harm from the termination of Mother's parental rights than from maintaining the status quo. *See id*. 72.

On January 21, 2016, CYS presented the testimony of Bethany Davis, the CYS family support caseworker assigned to the family. *See* N.T.,

1/21/16, at 6-8. At the time of the hearing, Mother was released from prison, and was on probation and residing at a recovery house in York. *See id*. at 8, 13. Father remained incarcerated at SCI-Camp Hill. *See id*. at 8. Ms. Davis testified that, as of the hearing on January 21, 2016, Mother had not completed the requirements through CYS in order for Child to be returned to her. *See id*. at 12-13. Ms. Davis testified that, at the time when Child was adjudicated dependent, Mother was incarcerated and that she was released in August 2014. *See id*. at 13. Subsequently, Mother was in a few recovery programs, and was released from recovery programs in January of 2015. *See id*.  Mother was again incarcerated on June 1, 2015, based on new charges of possession of a controlled substance and possession of drug paraphernalia, and not reporting to probation. *See id*. On June 1, 2015, the trial court sentenced Mother to serve six months' incarceration. *See id*. Mother was released from incarceration on December 17, 2015, and was on parole for six months and residing in a halfway house at the time of the January 21, 2016 hearing. *See id*. at 14. Ms. Davis testified that Child's therapy with ESS and Mother had been biweekly, and that Mother only missed one session. *See id*. at 16.

Ms. Davis testified that, in the six-month period prior to the filing of the termination petition in November of 2015, Mother had occasionally and randomly brought new toys or gifts to the visits with Child. *See id*. at 51. Mother had also brought Child Christmas, birthday, and other holiday gifts

coordinated with those events. *See id*. While Mother was incarcerated, she had written letters to Child. *See id*. Since Child was adjudicated dependent, Mother attended a school meeting in December of 2014, and attended the last few minutes of a school meeting held on March 16, 2015, due to her confusion regarding the meeting time. *See id*. at 51-52. Mother also attended a school conference in the spring of 2015. *See id*. at 52. Mother attempted to attend one of Child's appointments with a physician, but she had been provided an incorrect address, and, accordingly, she went to the wrong location. *See id*. at 52-53.

Mother presented the testimony of Jacqueline Hernandez, who is employed by Pressley Ridge. *See id*. at 68-69. She worked with Mother and Child beginning in March 2015. *See id*. She had weekly supervised meetings with Mother and Child between March 19, 2015 and June 5, 2015, observing the interaction between Mother and Child. *See id*. at 69-70. The visits lasted between two hours, in the beginning, and three hours, later in her involvement. *See id*. at 70. In response to questioning by the court, Ms. Hernandez responded that there was a relationship between Child and Mother. *See id*. at 71-72. In response to questioning by Mother's counsel, Ms. Hernandez testified that she observed Mother play age-appropriate games with Child, and help Child with her homework. *See id*. at 72. Ms. Hernandez responded that Mother acted as a parent during the visit. *See id*. at 74.

Ms. Hernandez observed a total of eleven visits, of which ten were with Mother and Child. *See id*. at 76. The last visit between Mother and Child was on May 29, 2015, and the final visit was between Child and Maternal Grandmother. *See id*. Following the visit with Maternal Grandmother, Ms. Hernandez closed the case and discontinued services, because Mother became incarcerated. *See id*. Ms. Hernandez never noticed Mother raising inappropriate adult issues with Child, and observed that the visits were age-appropriate. *See id*. at 78. Ms. Hernadez had a parenting program for Mother that concentrated on how Mother can play with Child in an age-appropriate way. *See id*. at 78-79. Mother was receptive to Ms. Hernandez's parenting advice, and steadily improved. *See id*. at 79.

After the testimony of Ms. Hernandez, CYS presented the direct examination of Ms. Davis as a rebuttal witness. *See id*. at 94. Ms. Davis testified that, based on Mother's lack of drug testing, lack of cooperation with probation and parole, Mother's housing situation, and Mother's eventual incarceration, visits between Child and Mother were never changed to partially supervised or unsupervised. *See id*. at 95-96. Ms. Davis testified that Child has a therapeutic support staff ("TSS") worker assigned to her in school to address and behavioral issues with Child. *See id*. at 100-101. On cross-examination by Mother's counsel, Ms. Davis testified that Child previously had the TSS for twenty-one hours per week, and now has the TSS for ten hours per week. *See id*. at 101. On cross-examination by Mother's

counsel, Ms. Davis responded that Mother and Child had been making progress in the equine therapy, and that Mother was never unwilling to participate in the therapy sessions. *See id*. at 102-103.

CYS then presented Ms. Davis as a witness with regard to the Agency's petition to change Child's permanency goal to adoption. *See id*. at 109. At that time, Mother had a part-time job and a full-time job, and tested negative for all substances on January 15, 2016. *See id*. at 110. On January 8, 2016, CYS was contacted because Child was extremely defiant in her foster care home, and was expressing fear of Mother returning to jail. *See id*. Ms. Davis testified that Child is not ready to be discharged from therapy with TSS, and that she continues to receive TSA services. *See id*. at 110-111. CYS requested that Child continue in its legal and physical custody, with placement with Foster Mother, pending the court's decision on the termination petition. *See id*. at 111.

Mother's counsel indicated Mother's agreement with Child's continuation in placement with Foster Mother, since Mother was in the recovery house, and was not able to care for Child. *See id*. at 111-112.

In the decree and order entered on March 30, 2016, the trial court granted the involuntary termination petition pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(5), (8), and (b), and the petition to change Child's permanency goal to adoption under the Juvenile Act, 42 Pa.C.S.A. § 6351.

On April 28, 2016, Mother timely filed notices of appeal and concise statements of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) with regard to the decree and order.[3]

On appeal, Mother raises three issues, as follows:

I. Whether the trial court erred in changing the goal from reunification to adoption without clear and convincing evidence that a change of goal would best serve the interests of the child[?]

…

II. Whether the trial court erred in terminating Appellant's parental rights without clear and convincing evidence that termination best served the emotional needs and welfare of the child[?]

…

III. Whether York County Office of Children Youth and Families failed to present clear and convincing evidence that termination of Appellant's parental rights best served the emotional needs and welfare of the child[?]

…

Mother's Brief[4], at 4[5] (unnecessary capitalization omitted).

_____

[3] The trial court's failure to set forth the factual background and procedural history of this appeal, and an analysis that related to our standards of review in either its opinion filed on May 2, 2016 or its opinion filed on May 31, 2016, delayed our disposition of the appeal. **Cf**. **In re T.S.M.**, 71 A.3d 251, 255 n.1 (Pa. 2013).

[4] Mother filed identical briefs in both appeals.

[5] We observe that Mother framed her issues somewhat differently in her concise statement, but we, nevertheless, find them preserved for our review.

In her first issue, Mother argues that the trial court erred in changing Child's permanency goal from reunification with parent to adoption. ***See*** Mother's Brief, at 9. Mother asserts that, while incarcerated, she maintained contact with Child, and availed herself of many of the resources available to her both in and out of prison. Mother alleges that she was consistent in her visits with Child under the direction of Child's therapist. ***See id***. Mother claims that she was making progress toward alleviating the circumstances that necessitated the original placement. ***See id***.

In her second, related issue, Mother contends that the trial court erred in terminating her parental rights, because the trial court failed to give sufficient weight to Child's best interest, the bond that existed between her and Child, and the long-term negative impact of the termination of her parental rights on Child. ***See id***. Mother asserts that, both before and after her release from prison, she maintained consistent visits with Child and attended therapeutic sessions at the direction of Child's therapist. ***See id***. Mother states that she was engaged in a parenting program, and was receptive to taking parenting advice. ***See id***.

Mother claims that, not only had she availed herself of many of the resources offered to her while she was incarcerated, but also she had worked diligently toward reunification with Child. ***See id***. Mother asserts that the trial court failed to consider the true extent of the bond between her and Child, Child's testimony that she would miss Mother if Child never saw

- 12 -

Mother again, and the therapist's testimony that Child would suffer a long-term negative impact should she have no contact with Mother. *See id*. Thus, Mother argues that the trial court did not have clear and convincing, competent evidence in the record upon which to terminate her parental rights. *See id*. Accordingly, Mother contends that the trial court erred because termination of Mother's parental rights was not in Child's best interests. *See id*.

Initially, we will address Mother's second issue. In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id*.
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during

the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained that

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id*. (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of § 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). The trial court terminated Mother's parental rights under § 2511(a)(5), (8), and (b). We will focus on subsections (a)(8) and (b), which provide as follows:

### § 2511.  Grounds for involuntary termination

- 14 -

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
>> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8) and (b).

In order to terminate parental rights pursuant to § 2511(a)(8), it must be demonstrated that: "(1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." ***In re Adoption of M.E.P.***, 825 A.2d 1266, 1275-1276 (Pa. Super. 2003); 23 Pa.C.S.A. § 2511(a)(8). "Section 2511(a)(8) sets a 12-month

time frame for a parent to remedy the conditions that led to the children's removal by the court." **In re A.R.**, 837 A.2d 560, 564 (Pa. Super. 2003). Once the twelve-month period has been established, the trial court must next determine whether the conditions necessitating placement persist, despite the reasonable good faith efforts supplied over a realistic period of time by the Agency. **See id**. Terminating parental rights under § 2511(a)(8) does not require the trial court to evaluate a parent's current "willingness or ability to remedy the conditions that initially caused placement." **In re Adoption of T.B.B.**, 835 A.2d 387, 396 (Pa. Super. 2003) (citation omitted).

We have explained that the focus in terminating parental rights under § 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). **See In re Adoption of C.L.G.**, 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*). In reviewing the evidence in support of termination under § 2511(b), our Supreme Court recently stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." **In re K.M.**, 53 A.3d 781, 791 (Pa. Super. 2012). In **In re E.M.**, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **In re K.M.**, 53 A.3d at 791.

- 16 -

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

> When evaluating a parental bond,
>
> the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P.,* 994 A.2d at 1121 (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008) (citation omitted).

With regard to § 2511(a)(8), the trial court found that, on the second day of the evidentiary hearing, Child had been removed from Mother's home for a period of twenty-one months between April 16, 2014, and January 21, 2016. *See* N.T., 3/30/16, at 9, 15.[6] The trial court also found that Child was adjudicated dependent, as lacking proper parental care and control, because of Mother's drug abuse and lack of employment, which left Child without appropriate housing and parental care. *See id*. at 9, 15-16. The trial court

---

[6] In its analysis of § 2511(a)(8), the trial court incorporated its reasoning with regard to § 2511(a)(5), in part. Moreover, the trial court found that, an additional two months had elapsed since the January 21, 2016 evidentiary hearing, so Child had been removed for a twenty-three-month period at the time of its decision.

found that the conditions that led to the removal of Child continued to exist.

***See id***. The trial court stated that, during the period of dependency, Mother

was incarcerated due to criminal convictions related to drug abuse. Mother

then successfully completed a drug rehabilitation program, and, apparently

was clean for a short period of time, then re-offended by committing crimes

related to drug abuse. ***See id***. Mother was re-incarcerated, and, at the time

of the second day of the evidentiary hearing, was in a halfway house or six-

month recovery house to work on her abuse of illegal drugs. ***See id***.

Finally, under § 2511(a)(8), the trial court found that clear and

convincing, competent evidence in the record that the termination of

Mother's parental rights would best serve Child's needs and welfare. ***See id***.

at 11. The trial court stated:

> Children need parents or at least one parent who is able
> and willing to properly care for them. They need stability. As the
> law says, they need permanency. Mother has not provided any
> of those to this child.
>
> We are not indicating or concluding that Mother does not
> want those things for her child. What we are indicating and
> concluding is that she has been incapable of providing those
> things for the child; and as I said a moment ago, children don't
> wait to grow up. Seven-year-olds need their parents now, not at
> some point in the future.
>
> Furthermore, this child has been lucky in one sense, and
> that is that she has been in the care of a foster parent who does
> provide proper –

* * *

[The proceedings were interrupted by Mother's crying.]

- 18 -

Do [sic] termination of [M]other's parental rights to [Child] best serve the needs and welfare of [Child]? As I said a moment ago, yes. I have already explained why I believe that is true, and I was about to explain that the good news for [Child] is that she has an adult who has been providing proper parental care and control for her, her foster mother.

N.T., 3/30/16, at 11-13, 15. **See also** Trial Court Opinion, 5/2/16, at 9-10.[7]

With regard to its analysis under § 2511(a), the trial court found the following:

[Child] has formed a close, positive bond with the foster mother, is comfortable in the foster mother's home, and is doing well.

We do not conclude that Mother and [Child] don't have a bond. We think they do have a bond, and we think that [Child] will be sad if she never gets to see her [m]other again. We think that [Child] may, in a sense, mourn for some time the loss of her [m]other, but the bond that Mother and daughter have is not positive. In fact, it is detrimental to the welfare of [Child].

As the evidence presented at the hearing clearly indicates, [Child] is having a very difficult time coming to terms with her [m]other's behavior towards her. She is receiving extensive therapy to deal with that issue. She doesn't trust her [m]other. She believes her [m]other is a liar. She is very angry with her [m]other, so not only does Mother's termination of parental rights to [Child] help [Child] to move beyond that problematic relationship she has with her [m]other, it allows her to continue the positive relationship she has with [F]oster [M]other. It will give her the ability to have a stable home where her needs and maybe even her wants will properly be taken care of.

_____

[7] In its opinion entered on May 2, 2016, the trial court set forth the reasoning for its conclusion that CYS had sustained its burden under § 2511(a)(8) and (b), adopting the analysis which it gave on the record at the hearing held on March 30, 2016.

Therefore, we conclude that all of the elements necessary to terminate Mother's parental rights under Section 2511(a)[(8)] have been clearly and convincingly proven.

N.T., 3/30/16, at 13-15. *See also* Trial Court Opinion, 5/2/16, at 10-11.

Regarding § 2511(b), the trial court stated as follows:

Other considerations the law requires this [c]ourt to make are whether or not in terminating Mother's parental rights to [Child] the developmental, physical, and emotional needs and welfare of the child will be affected. We believe they will be.

As we have already explained, children need consistent, stable, and, to the extent possible, permanent parenting. Children need parents that are able and willing to provide proper care and control for the child.

Mother remains incapable of providing that consistent, stable, and proper parenting for [Child]. [Child's] foster mother has been and is able to continue to provide that consistent, stable, proper parenting for [Child].

Furthermore, as we previously indicated, [Child] needs a chance to move beyond the turmoil that her [m]other's actions have visited upon her. She needs to be able to move forward and grow up and develop free of the kind of negatives that her [m]other brought into her life. We hope that the therapy that [Child] is currently undergoing will ultimately allow that to happen. We think it is much less likely to happen if Mother's parental rights to [Child] are not terminated.

We also note that we are not terminating Mother's rights to [Child] merely because of environmental factors or concerns that are beyond her control. As we stated earlier in this decision, we think Mother, if she could permanently address her substance abuse issue, would be capable of providing adequate housing, clothing, medical care, and parenting to [Child]. Her inability to provide those things to [Child] is not beyond her control. We believe she could provide those things but for her ongoing battle with drug abuse.

N.T., 3/30/16, at 16-17. *See also* Trial Court Opinion, 5/2/16, at 12-14.

In her brief, Mother first challenges the trial court's determination regarding the best interests analysis under § 2511(a)(8). She argues that Child's therapist, Ms. Williams, testified that Mother had been committed to the therapeutic process, and had attended sessions regularly beginning in December 2014, and for a six-month period thereafter. **See** Mother's Brief, at 16. Mother also asserts that Ms. Williams testified that Child would suffer a long-term negative impact should she have no contact with Mother. **See id**. Mother cites Ms. Williams' testimony that Child knows Mother and cares about her, and, if Child did not have that connection it would have a negative impact on Child. **See id**. Mother acknowledges that, upon further questioning by the trial court, Ms. Williams testified that Child would ultimately suffer less harm in terminating Mother's parental rights than in not terminating Mother's parental rights. **See id**. Mother alleges, however, that Ms. Williams' concession does not negate her testimony that providing no contact between Child and Mother may not best serve Child's needs and welfare. **See id**.

In its opinion filed pursuant to Pa.R.A.P. 1925(a), the trial court found that Ms. Williams testified as Mother asserts in her brief. **See** Trial Court Opinion, 5/31/16, at 2. The trial court emphasized, however, that Ms. Williams ultimately testified, upon questioning by the court, "Child will suffer less harm if Mother's parental rights were terminated than she would if they were not terminated." Trial Court Opinion, 5/31/16, at 2 (citing N.T.,

12/21/15, at 72) (emphasis omitted). The trial court also incorporated its discussion of Child's needs and welfare under a best interest analysis with regard to § 2511(a)(8), as set forth in its on-record decision. *See* Trial Court Opinion, 5/31/16, at 2 (citing N.T., 3/30/16, at 9-13).

The instant case is factually similar to *In re C.L.G*, in which the mother was incarcerated after she re-offended on drug charges relating to her history of drug involvement. This Court, sitting *en banc*, affirmed the termination of the mother's parental rights to her two-year-old child under § 2511(a)(8). We reasoned that the trial court properly assessed the credibility and weighed the evidence, including the mother's promises to be able to care for her child upon her release from a halfway house. *See* 956 A.2d at 1007-08. We concluded that, given the mother's life-long history of drug involvement, the re-introduction of the child to the mother could be devastating to the child's well-being. *See id*. at 1008-09. Likewise, we determined that the trial court had properly found that there was no bond between the child and the mother that, if severed, would be detrimental to the child, as the mother had not given the child the stability and security that the child required. *See id*. at 1010. In contrast, the child had a strong bond with her foster mother, and the severance of that bond could have had a devastating effect on the child. *See id*. We concluded that the termination of mother's parental rights best served the child's needs and welfare under § 2511(b), as the foster mother had provided the child with the permanency

necessary for the fulfillment of her potential in a permanent, healthy, and safe environment. The trial court did not credit the mother's testimony that she could also provide such an environment for the child. *See id*. at 1010-11.

After a careful review of the record in this matter, we conclude the trial court's factual findings are supported by the clear and convincing, competent evidence in the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *See In re Adoption of S.P.*, 47 A.3d at 826-27; *In re C.L.G.*, 956 A.2d at 1007-11. We, therefore, affirm the termination of Mother's parental rights with regard to § 2511(a)(8).

Mother next challenges the trial court's best interest analysis under § 2511(b). Mother asserts that, during her incarceration, she wrote and sent letters to Child, and occasionally brought Child new toys or gifts. *See id*. at 16. Appellant states that she attended a school meeting in December 2014, a portion of a school meeting on March 16, 2015, and a school conference. *See id*. at 16-17. Further, Mother asserts that attempted to attend a physician's appointment of Child, but was given an incorrect address and went to the wrong location. *See id*. at 17. Moreover, Mother cites the testimony of Ms. Wurster and Ms. Hernadez from Pressley Ridge to support her contention that she was engaged in a parenting program and was making progress, and that Child would be saddened if she never sees Mother

again. *See id*. Mother also cites her counsel's cross-examination of Ms. Davis, during which Ms. Davis responded that Mother and Child had been making progress in the equine therapy, and that Mother was never unwilling to participate in the therapy sessions. *See id*.

Regarding § 2511(b), Mother states that, upon questioning by the court, Ms. Williams testified that Child needs to have contact with Mother throughout her life, because she knows Mother and she is not an infant. *See* Mother's Brief, at 18. Mother asserts that, given Child's RAD, Ms. Williams' testimony raised more questions than it provided answers. She complains that CYS failed to perform an independent assessment of the long-term effect of termination of Mother's parental rights on a child with RAD. *See id*. at 18.

Again, as set forth above, the trial court stated:

Furthermore, as we previously indicated, [Child] needs a chance to move beyond the turmoil that her [m]other's actions have visited upon her. She needs to be able to move forward and grow up and develop free of the kind of negatives that her [m]other brought into her life. We hope that the therapy that [Child] is currently undergoing will ultimately allow that to happen. We think it is much less likely to happen if Mother's parental rights to [Child] are not terminated.

We also note that we are not terminating Mother's rights to [Child] merely because of environmental factors or concerns that are beyond her control. As we stated earlier in this decision, we think Mother, if she could permanently address her substance abuse issue, would be capable of providing adequate housing, clothing, medical care, and parenting to [Child]. Her inability to provide those things to [Child] is not beyond her control. We believe she could provide those things but for her ongoing battle with drug abuse.

- 24 -

N.T., 3/30/16, at 16-17. **See also** Trial Court Opinion, 5/2/16, at 13-14.

Additionally, we find that the trial court's conclusion that the bond between Mother and Child is not a positive bond, but, rather is detrimental to child's welfare, is supported by clear and convincing, competent evidence in the record. Mother has left Child neglected while in her care through her drug abuse and through her repeated incarcerations, and Child has negative feelings because of Mother's neglect. At the same time, the trial court found from the evidence at the evidentiary hearings that Child has positive feelings for Foster Mother, which Mother does not challenge.

A parent's abuse and neglect are likewise a relevant part of the bond/effect analysis:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d 753, 763-764 (Pa. Super.

2008) (affirming the involuntary termination of the mother's parental rights, despite the existence of some bond, where placement with the mother would be contrary to the child's best interests, and any bond with the mother would be fairly attenuated when the child was separated from her, almost constantly, for four years).

In fact, our Supreme Court has observed that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *In re: T.S.M.*, 620 Pa. 602, 627, 71 A.3d 251, 267 (2013) (quoting *In re K.K.R.-S.*, 958 A.2d at 535). The Supreme Court instructed, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *In re: T.S.M.*, 620 Pa. at 629, 71 A.3d at 267 (quoting *In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J. dissenting)).

This Court has stated: "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004)

(internal citations omitted). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting")).

Again, we find this case similar to *In re C.L.G.*, in which the trial court did not credit the mother's testimony that she could also provide a stable, secure, and drug-free environment for the child. *See* 956 A.2d at 1010-1011. We conclude the trial court's factual findings are supported by the clear and convincing, competent evidence in the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of S.P.*, 47 A.3d at 826-27; *In re C.L.G.*, 956 A.2d at 1007-1011. We, therefore, affirm the termination of Mother's parental rights with regard to § 2511(b).

Finally, Mother complains that there was a lack of clear and convincing, competent evidence in the record to support the trial court's change of Child's permanency goal to adoption.

This matter is controlled by the Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq*. The Pennsylvania Supreme Court recently set forth our standard of review in a dependency case as follows:

> "The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the

> lower court's inferences or conclusions of law." ***In re R.J.T.***, 608 Pa. 9, [27], 9 A.3d 1179, 1190 (Pa. 2010). We review for abuse of discretion[.]

***In Interest of: L.Z.***, ***A Minor Child***, 111 A.3d 1164, 1174 (Pa. 2015).

When considering a petition for goal change for a dependent child, the trial court considers

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

***In re A.K.***, 936 A.2d 528, 533 (Pa. Super. 2007) (citing 42 Pa.C.S.A. § 6351(f)).

Regarding the disposition of a dependent child, § 6351(e), (f), (f.1), and (g) of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

Here, Mother cites the trial court's opinion for the statement, "perhaps [Mother] now is successfully battling her substance abuse problem." Mother's Brief, at 12 (citing Trial Court Opinion, 5/2/16, at 15). Mother asserts that the trial court failed to properly consider that she was making progress toward alleviating the circumstances that necessitated the original

placement of Child. Thus, she contends that the trial court erred in changing Child's permanency goal from reunification to adoption. **See id**. at 12.

Mother omits, however, the following statement:

Unfortunately, we note that she did that before but it didn't stick. We hope that Mother's efforts currently will stick. Very frankly, given the history of her involvement with drugs, we are not optimistic.

We don't say that lightly. We understand how difficult it is for many people to fight addictions. We are not making light of them. But again, [Child] can't wait to grow up. She needs a parent now, and she has needed one for quite some time.

Trial Court Opinion, 5/2/16, at 15-16.

In its Pa.R.A.P. 1925(a) opinion, the trial court states that it did take the matters challenged by Mother into account. **See** Trial Court Pa.R.A.P. Opinion, 5/31/16, at 4. Mother simply does not agree with the weight that the trial court placed on them.

We conclude the trial court's factual findings are supported by the clear and convincing, competent evidence in the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **See In re Adoption of S.P.**, 47 A.3d at 826-27. We, therefore, affirm the trial court's change of Child's permanency goal to adoption.

Decree and order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/28/2016</u>